UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANN KLINK,

             Plaintiff,                        Civil Action No. 12-15172

       v.                            District Judge Arthur J. Tarnow
                                          Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

             Defendant.
_____/

## REPORT AND RECOMMENDATION TO
## GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8] AND
## DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]

Plaintiff Ann Klink appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 3) are the parties' cross-motions for summary judgment (Dkts. 8, 12). For the reasons set forth below, the Court finds that the Administrative Law Judge erred in failing to rely on the opinion of a medical expert regarding whether Plaintiff's physical impairments medically equal the severity of one of the "listed" impairments that the Commissioner considers presumptively disabling. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED,

1

and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. PROCEDURAL HISTORY

Plaintiff's first application for disability insurance benefits, filed October 16, 2001, was denied in a May 21, 2003 decision by Administrative Law Judge Regina Sobrino. (Tr. 26–7.) On February 6, 2006, Plaintiff protectively filed a new application for disability insurance benefits, asserting that she became unable to work on January 1, 2002. (Tr. 75, 216.) The Commissioner initially denied the application on May 18, 2006. (Tr. 75.) Plaintiff then requested an administrative hearing, and on July 25, 2008, she appeared with counsel before Administrative Law Judge E. James Gildea, who considered her case *de novo*. (Tr. 34–57.) At the hearing, Plaintiff amended her alleged onset date to August 30, 2005. (Tr. 36–37.) In a September 3, 2008 decision, ALJ Gildea found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 79–86.) On April 28, 2010, the Social Security Administration's Appeals Council granted Plaintiff's request to review the decision and, finding that ALJ Gildea failed to adequately consider the severity and effects of Plaintiff's de Quervains tenosynovitis and obesity, vacated and remanded. (Tr. 89–90.) Administrative Law Judge Regina Sobrino held a hearing on August 1, 2011, at which Plaintiff appeared with counsel and testified.[1] In an August 15, 2011 decision, ALJ Sobrino considered the issues identified in the Appeals Council's order and found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 18–29.) ALJ Sobrino's decision became the final decision of the Commissioner on October 17,

---

[1] The transcript for this hearing is not in the administrative record filed in this case. (*See* Dkt. 6.) Plaintiff did not object; she based her arguments on the record as filed.

2012, when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this

suit on November 26, 2012. (Dkt. 1, Compl.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security

income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d

727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of
> any medically determinable physical or mental impairment which
> can be expected to result in death or which has lasted or can be
> expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the

application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not
> disabled.
>
> 2. If claimant is not doing substantial gainful activity, his
> impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is
> suffering from a severe impairment that has lasted or is expected to
> last for a continuous period of at least twelve months, and his
> impairment meets or equals a listed impairment, claimant is
> presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his
> past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his
> past relevant work, if other work exists in the national economy
> that accommodates his residual functional capacity and vocational
> factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Sobrino applied this framework to Plaintiff's case as follows. At step one, ALJ Sobrino found that Plaintiff had not engaged in substantial gainful activity from May 22, 2003, the first day of the unadjudicated period, through December 31, 2007, her date last insured. (Tr. 20.) At step two, she found that through the date last insured, Plaintiff had the following severe impairments: degenerative joint disease (status post rotator cuff repairs), fibromyalgia, rheumatoid arthritis ("RA"), de Quervain's tenosynovitis, and obesity. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 21.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to

perform sedentary work as defined in 20 CFR 404.1567(a),[2] with

---

2 The RFC category of sedentary work is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a). Social Security Ruling 83-10 adds that " periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." And further: "By its very nature, work performed primarily in a seated position entails no significant stooping. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."

> the following additional limitations: no pushing or pulling more
> than 5 pounds; no forceful gripping/grasping; no twisting
> movements of the hands; should have the opportunity to alternate
> sitting and standing at will; no climbing ladders, ropes or
> scaffolds; occasional climbing of stairs, balancing, stooping,
> kneeling, and crouching; no crawling; no reaching above shoulder
> level; frequent handling, fingering, and reaching; no exposure to
> hazards; and no driving as a work duty.

(Tr. 21.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work.

(Tr. 27) At step five, the ALJ found based on vocational expert testimony that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 28.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from January 1, 2002, through December 31, 2007, the date last insured. (Tr. 29.)

## III. THE ADMINISTRATIVE RECORD

### A. Testimony at the Hearing Before the ALJ

The following testimony was given at the July 25, 2008 hearing before ALJ Gildea. As noted, a transcript of the August 1, 2011 hearing before ALJ Sobrino is not in the administrative record filed in this case. Plaintiff's argument focuses on the testimony at the July 25, 2008 hearing.

### 1. Plaintiff's Testimony

Plaintiff testified that she was 49 years old at the time of the hearing. (Tr. 39–40.) She said she had two years of college but no degree. (Tr. 41.) She worked for Delphi for 20 years doing steering gear assembly, including seven years in a department for people with work restrictions. (Tr. 41–42, 52.) She could not do anything repetitive and could not lift due to

5

rheumatoid arthritis and torn rotator cuffs in both shoulders. (Tr. 42–43.) In 2001, she was put on disability leave because there was no job that could accommodate her restrictions. (Tr. 42.) Plaintiff said she had been receiving a disability pension from Delphi since 2001. (Tr. 41.) She also received a workers' compensation payout in 2005. (*Id.*)

Plaintiff said she'd had five surgeries on her rotator cuffs because "they just kept ripping." (Tr. 43.) The first was in 1998. (*Id.*) When the ALJ asked whether she had "residual soreness" from her surgeries, she said yes, but she did not know whether it was from the surgeries or from the rheumatoid arthritis. (Tr. 50.)

Plaintiff testified that she was first diagnosed with rheumatoid arthritis in 2001 or 2002. (*Id.*) She said her joints were swollen "almost constantly." (Tr. 44; *see also* Tr. 48.) The RA affected her hands, knees, ankles, and shoulders. (*Id.*) She also had back pain, which she believed was related to the arthritis. (Tr. 47.) Her RA symptoms were mostly pain and stiffness, and sometimes her hands would "go numb," which caused her to drop things. (Tr. 46.) When the ALJ asked whether anything exacerbated her condition besides activity, Plaintiff said not that she was aware; when the ALJ asked whether weather affected her condition, she said she had not noticed that it was a factor because she was "sore all the time." (Tr. 46.)

Plaintiff said she was treating her RA with weekly Enbrel injections, Methotrexate, folic acid, and Vicodin as needed, "maybe three or four times a week now." (Tr. 44.) She had tried Aleve in place of Vicodin but it did not "help much." (Tr. 45.) She said the injections brought

down her "sed rate," but the swelling and pain persisted.[3] (Tr. 44.) She did not experience side effects from the injections, but did have some from the Vicodin; it made her "wiry" and unable to sleep. (Tr. 45, 49.) She had also tried cortisone injections and had done physical therapy after surgery. (Tr. 46.) Her doctors recommended exercise, but she said her ankles were too swollen for her to walk. (Tr. 47.) She said she tried to elevate her feet when lying down to alleviate the swelling. (Tr. 48.)

When the ALJ asked Plaintiff about her activity around the house, she said she did some laundry and cooking, but her husband carried the laundry baskets and she found it painful to open jars and the locked dishwasher. (Tr. 45.) She no longer cooked very frequently, and she used to enjoy cleaning the house "but now it's painful and hurting." (Tr. 49.) She said she vacuumed once a week. (Tr. 47.) She did not have friends come and visit often. (*Id.*) Plaintiff testified that she spent 50 to 60 percent of the day lying down. (Tr. 45.)

Plaintiff said she had not engaged in her hobbies—gardening, snowmobiling, and being outside—since 2000 or 2001. (Tr. 46.) She had recently canceled a vacation to Michigan's upper peninsula because of her pain. (Tr. 46–47.)

On questioning by her attorney, Plaintiff testified that she did not sleep "very well at all" because of pain or Vicodin side effects, her energy level during the day was "very low," and she napped "one to two times a day for about an hour or two a day." (Tr. 49.) She also said she "frequently" had problems holding on to objects in her hands. (Tr. 49.)

---

3 An erythrocyte sedimentation rate, commonly called a "sed rate," is a test that indirectly measures how much inflammation is in the body. U.S. Nat'l Lib. of Med., MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003638.htm (last updated Feb. 3, 2014).

In addition to her joint pain, Plaintiff's "muscles were aching and painful to the touch." (Tr. 50.) She had a diagnosis of fibromyalgia but did not know much about it. (*Id.*)

### 2. The Vocational Expert's Testimony

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's. The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who had

> the residual functional capacity to lift up to 10 pounds occasionally, less than 10 pounds frequently; to stand or walk two hours out of an eight hour day with normal breaks; and sit up to six hours out of an eight hour day with normal breaks; is not required [to] climb[] ladders, ropes, or scaffolds; no more than occasional climbing of ramps and stairs; no more than occasional balancing, stooping, kneeling, crouching, and crawling; does not require overhead lifting and does not require more than frequent reaching, handling or fingering.

(Tr. 53.) The VE testified that such an individual could find work as a cashier (15,000 jobs in the state of Michigan), and visual inspector (7,000 jobs in Michigan). (Tr. 54.)

The ALJ next asked about a hypothetical individual with the same restrictions who was also limited to only occasionally handling and fingering. (*Id.*) The VE said "that would preclude all of those jobs." (Tr. 54.)

Plaintiff's counsel asked the VE about the typical number of absences allowed per month in competitive employment. (Tr. 54–55.) The VE testified that "if a person approaches about a day a month doing unskilled work over a period of several months, they would be in serious trouble with their employer, possibly fired." (Tr. 55.) Counsel next asked whether it would

8

preclude work if a person needed to nap or lie down outside the typical breaks; the VE said, "Generally it would if it were on a routine and regular basis, yes. That's an accommodation issue." (*Id.*)

### B. Medical Evidence

As discussed below, the only issue before the Court is whether the ALJ's decision to discount Plaintiff's testimony about her physical symptoms is supported by substantial evidence. The following summary is limited to evidence relevant to that issue. It is also limited to evidence relevant to Plaintiff's impairments between May 22, 2003, the first day of the unadjudicated period, through December 31, 2007, her date last insured.

The administrative record contains notes from five visits to Plaintiff's family practitioner Teresa Pietrus, M.D., between November 2003 and March 2006. (Tr. 323–33.) Dr. Pietrus's handwritten notes are partly illegible, but it is apparent that Plaintiff complained of joint pain at her November 2005 visit (Tr. 327) and sleeping problems at her March 2006 visit (Tr. 323). Dr. Pietrus was also treating Plaintiff for depression, anxiety, and headaches. (*See* Tr. 323–33.) On January 13, 2005, Plaintiff wrote on a questionnaire that her "Major life changes . . . since last visit" included "loss of job." (Tr. 330.) At the time her last visit to Dr. Pietrus, so far as the record indicates, was November 10, 2003. (*See* Tr. 333.) The examination notes from Plaintiff's November 2003 visit indicate that she had not been seen in two years and she had "been feeling fine." (*Id.*) Dr. Pietrus wrote that Plaintiff's "rheumatoid arthritis is very well controlled on the Azulfidine and Methotrexate." (*Id.*)

9

Plaintiff was being treated by rheumatologist Carlos Diola for her rheumatoid arthritis. (*See* Tr. 361, 367–73, 375–78, 531–32, 538, 544.) Dr. Diola saw Plaintiff at least 16 times between April 2003 and March 2008. (*See id.*) Plaintiff complained of pain and related symptoms at each appointment, including aching, swelling, stiffness, and pain in her feet; aching, stiffness, soreness, and swelling in her hands, especially the thumb joints; locking, clicking, soreness, and pain in her lower back; knee soreness, stiffness, and "giving way"; and ankle swelling, stiffness, and pain. (*See id.*) She also sometimes complained of problems sleeping, feeling tired all the time, and having low energy. (See Tr. 368, 370, 373, 375, 376, 538.) Plaintiff denied numbness and tingling in April and July 2003 (Tr. 377, 378), but in September 2007 she reported occasional numbness and tingling of her hands (Tr. 531), and in December 2005 she said she was finding it difficult to hold objects (Tr. 368). At times she reported that her medications were helping. (*See* Tr. 361, 367, 372, 376, 531.) At other times she reported flareups or increased symptoms. (See Tr. 368, 370, 378, 544.) She said her symptoms were worse in the morning, with stress, and with increased activity. (*See* Tr. 361, 371, 372, 373, 375, 376, 378.)

Dr. Diola found puffiness and tenderness in Plaintiff's joints at ten examinations (Tr. 361, 369–71, 373, 375–76, 378, 538, 544 (Apr., Sep., and Dec. 2003, June and Dec. 2004, May, Aug., and Sep. 2005, Nov. 2006, Mar. 2008)), and no puffiness or tenderness at six examinations (Tr. 367–68, 372, 377, 531–32 (Jul. 2003, Mar. and Dec. 2005, Mar. 2006, Feb. and Sep. 2007)). He noted lower back spasms during examinations on July and December 2003. (Tr. 375, 377.) For the most part he did not comment on range of motion testing, but in July 2003 he found

"anterior lumbar spine flexion is adequate." (Tr. 377.) And he noted adequate range of motion in the ankle joints in September 2005 (Tr. 369), but found restricted range of motion in the ankle joints in August 2005 (Tr. 370). He noted no "chronic rheumatoid deformities" at most examinations (Tr. 367–70, 372, 531–32, 538, 544), but in December 2003 found "mild dorsal hand atrophy" (Tr. 375). Other examination findings included positive Finkelstein's tests in December 2005, November 2006, and February 2007 (Tr. 368, 532, 544), and negative Tinel's test bilaterally in September 2007 (Tr. 531).[4] Dr. Diola also mentioned results of some imaging studies: in July 2003 he wrote that her lower spine x-rays from the previous year were "fairly benign" and therefore her pain "may . . . be myofascial and from paravertebral spasms" (Tr. 377),[5] and in June 2004 he wrote that x-rays of both hands showed mild periarticular Osteopenia," and "previous imaging studies including MRI of the wrists suggest concomitant degenerative change" (Tr. 361).

Dr. Diola consistently diagnosed rheumatoid arthritis with mild joint synovitis, de Quervain's tenosynovitis, and lumbalgia.[6] (*See* Tr. 361, 367–73, 375–78, 531–32, 538, 544.) In

---

4 Finkelstein's test is used to diagnose de Quervain's tenosynovitis. *See* American Academy of Orthapaedic Surgeons, OrthoInfo, *De Quervain's Tendinosis*, http://orthoinfo.aaos.org/topic.cfm?topic=A00007 (last updated Dec. 2013). The Tinel sign is used to diagnose nerve disorders such as carpal tunnel syndrome. *See Dorland's Illustrated Medical Dictionary* (31st ed. 2007) [hereinafter "*Dorland's*"]; U.S. Nat'l Lib. of Med., MedlinePlus, http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm.
5 Myofascial means pertaining to muscle tissue. *See Dorland's*.
6 Synovitis is inflammation of the tissue around a joint. *See Dorland's*. De Quervain's tenosynovitis is painful swelling of the tendons from the thumb to the wrist. *See* U.S. Nat'l Lib. of Med., MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/patientinstructions/000537.htm (last updated Feb. 3, 2014). Lumbalgia is lumbar, or lower back, pain. *See Webster's Third New International Dictionary, Unabridged* (2002), http://www.merriam-webster.com/dictionary/-algia, http://www.merriam-webster.com/dictionary/lumbar.

December 2003, he also diagnosed mild lumbar spondylosis.[7] (Tr. 375.) And in August and December 2005, he noted that more than 11 fibromyalgia tender points were present, and included fibromyalgia in his diagnosis (*See* Tr. 368, 370.) Dr. Diola prescribed Azulfidine, Methotrexate, Mobic, Soma, Bextra, Relafin, Lodine, Enbrel injections, Depo Medrol injections, folic acid, and Vicodin at various times in various combinations, but eventually discontinued all but the Enbrel, Methotrexate, folic acid, and Vicodin. (*See* Tr. 361, 367–73, 375–78, 531–32, 538, 544.) He also discussed other treatment options including back stretching exercises, heat immersion, thumb splints, topical creams, and alternative remitting therapy. (*See* Tr. 368, 377–78, 532, 544.) In August 2005 he prescribed an ankle brace. (Tr. 370.)

Plaintiff's shoulder issues were treated by orthopedic surgeon Anthony de Bari. (*See* Tr. 386–91.) Dr. de Bari or his physician assistant Jason Maxa examined Plaintiff at least six times between January 2003 and March 2006. (*See id.*) He performed surgery to repair her left rotator cuff in July 2002. (Tr. 382.) In January 2003, Dr. de Bari wrote that Plaintiff was "still stiff and sore, but not too uncomfortable," and had "full range of motion of especially the left shoulder and minimal tenderness." (Tr. 391.) But in April 2004, she returned "complaining of a lot of problems with both of her shoulders." (Tr. 390.) On examination, Dr. de Bari found "some positive impingement signs with exquisite tenderness over the bicipital tendon bilaterally" and "pain on resisted flexion of the abducted shoulder." (*Id.*) He gave her an injection and scheduled follow up in six weeks. (*Id.*) At the follow-up, she reported "[b]asically no improvement" and said "[t]he injections did nothing but hurt for a while." (Tr. 389.) She still had pain on range of

---

7 Spondylosis is defined as degenerative spinal changes due to osteoarthritis. *Dorland's*.

motion with both shoulders. (*Id.*) Dr. de Bari recommended an MRI "to see if there is anything else going on that is remediable to surgical intervention, as she does not seem to be doing well with any other conservative measures." (*Id.*)

A June 2004 MRI of Plaintiff's right shoulder showed degenerative changes associated with evidence of impingement on the musculotendinous junction of the rotator cuff, and findings consistent with a full thickness tear in the rotator cuff tendon. (Tr. 405–406.) In the left shoulder, the MRI showed degenerative changes with evidence of impingement on the musculotendinous junction of the rotator cuff, mild atrophy of the shoulder muscles, and findings consistent with a full thickness tear in the rotator cuff tendon. (Tr. 406.)

Plaintiff underwent surgery to repair the tear in her right rotator cuff in January 2006. (*See* Tr. 394–401.) Two weeks later, Dr. de Bari wrote that she was "progressing fair," with passive range of motion under 90 degrees. (Tr. 388.) Six weeks after the surgery, she reported that she was "doing phenomenal" and "not really taking any pain medication." On examination, she had "full flexion and abduction of the shoulder without any real complaint of pain" but her strength was "fair at best within the shoulder" and "still cause[d] discomfort with manual muscle testing." (*Id.*) At the three-month follow-up in March 2006, Plaintiff reported doing well, with good progress in physical therapy and "a subtle amount of soreness only in the shoulder on a rare occasion." (Tr. 386.) Examination revealed full range of motion of the shoulder, "really good strength within the shoulder," and "[m]inimal to no tenderness." (*Id.*)

After the surgery on Plaintiff's right shoulder, she attended physical therapy from March to April 2006. (See Tr. 458–63.) Her discharge summary reported that all goals were met:

13

Plaintiff's pain level was down to zero, she was sleeping normally, and she had no difficulty reaching up to wash her hair, reaching into cupboards, or lifting a gallon of milk. (*See* Tr. 459, 463.)

There is no assessment of Plaintiff's physical limitations by a DDS medical consultant in the record, as the ALJ noted. (Tr. 25.) The only medical opinion in the record regarding Plaintiff's physical functional limitations was provided by Dr. Diola on July 28, 2008. (Tr. 539–40.) Dr. Diola indicated that Plaintiff could occasionally lift or carry up to ten pounds, frequently lift or carry less than ten pounds, stand or walk up to two hours of an eight-hour workday with normal breaks, could not sit continuously but must alternate sitting and standing, and was moderately limited in ability to push or pull with the upper and lower bilateral extremities. (Tr. 540.) He said these limitations had existed for "several years," and that they would likely disrupt a regular job schedule with low physical demands approximately 16 hours per month. (*Id.*)

## IV. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512–13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

15

**V. ANALYSIS**

Plaintiff's brief does not clearly set forth her claims of error. As far as the Court can tell, she argues that the ALJ erred by discounting some of Plaintiff's testimony about her symptoms when the ALJ formulated the RFC and the hypothetical questions to the vocational expert. (*See* Dkt. 8, Pl. Mot. at 7–12.) In particular, Plaintiff cites her testimony that she has limited ability to be on her feet or sit for prolonged periods of time, must elevate her feet to avoid swelling of the ankles, cannot hold onto small items, naps twice a day, is constantly sore, and must lie down for approximately 50 to 60 percent of the day. (Pl. Mot. at 9–12 (citing Tr. 45–49).) The Commissioner responds that the record does not support Plaintiff's complaints. (Def.'s Mot. at 5–10.) She also notes that the ALJ cannot find a claimant disabled based solely on subjective complaints (citing 20 C.F.R. §§ 404.1528, 404.1529), is not required to credit a claimant's subjective complaints, especially if those complaints are not supported by the objective medical evidence (citing *Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1995)), and is required to include only credible limitations in the hypothetical question to the vocational expert (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)). (Def.'s Mot. at 5.)

An ALJ's credibility assessment proceeds in two steps. If the ALJ first concludes that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, then the ALJ must evaluate the "intensity and persistence" of the claimant's symptoms. 20 C.F.R. § 416.929(c)(1). At the second step, an ALJ should not reject a claimant's allegations "solely because the available objective medical evidence does not substantiate [the

16

claimant's] statements." 20 C.F.R. § 416.929(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. Instead, an ALJ should consider the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; factors that precipitate or aggravate the claimant's symptoms; the type, dosage, effectiveness, and side effects of the claimant's medication; treatment other than medication that the claimant receives; measures the claimant uses to relieve pain or other symptoms; and "[o]ther factors." 20 C.F.R. § 416.929(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight," S.S.R. 96-7p, 1996 WL 374186 at *2. Within this two-step framework, a court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle.").

Here, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible because they are not consistent with other evidence of record." (Tr. 22.) ALJ Sobrino then provided a very detailed summary of the evidence. (*See* Tr. 22–27.) In particular, she noted

17

that "[t]hroughout the period at issue, treatment for rheumatoid arthritis was conservative, consisting of medications," with no adverse side effects reported, and "claimant continued to be able to carry out activities of daily living that included doing household chores, shopping, driving, and maintaining social contacts." (Tr. 27.) The ALJ's summary of Plaintiff's treatment records includes evidence that could undermine the alleged severity of Plaintiff's conditions, such as her repeated denial of numbness and tingling in her hands, reported improvement on medications, and some normal examination findings, labwork, and imaging results. (*See* Tr. 22–27.) The Court's own review of the medical records suggests that Plaintiff's condition fluctuated a great deal. Normal examination findings and reports of improvement alternate with reported flareups and findings consistent with degeneration. But the ALJ did not ignore the evidence that supported Plaintiff's alleged severity; her summary accurately reflects the complexity of the record. And her RFC was consistent with that complexity; she incorporated many of Plaintiff's alleged limitations, including limitation to no more than about two hours of standing or walking in an eight-hour day and lifting no more than ten pounds occasionally, and a requirement that she be able to sit or stand at will.[8] (Tr. 21.) Altogether, there is no error or deficiency so glaring that it can overcome the deference due the ALJ's findings regarding Plaintiff's credibility. *See Jones*, 336 F.3d at 476.

Yet the Court cannot overlook the absence from the record of any assessment of Plaintiff's physical limitations by a DDS medical consultant. (*See* Tr. 25.) In particular, there is no medical expert opinion in the record on whether Plaintiff's physical impairments (alone or

---

8  The hearing before ALJ Sobrino is not in the record, so the Court can only assume that the ALJ's hypothetical question to the VE mirrored this RFC.

18

combined with her mental impairments) medically equal a listed impairment. Social Security Ruling ("SSR") 96-6p requires that the "judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight."[9] SSR 96-6p, 1996 WL 374180 at *3 (1996); *see also* 20 C.F.R. § 416.926(c) ("We also consider the opinion given by one or more medical or psychological consultants designated by the Commissioner."); *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); *Barnett v. Barnhart*, 381 F.3d 664, 667, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *4 (E.D. Mich. Sep. 25, 2013) (remanding because there was no expert medical opinion on the issue of equivalence, collecting cases); *Manson v. Comm'r of Soc. Sec.*, No. 12-11473, 2013 WL 3456960, at *11 (E.D. Mich. July 9, 2013) (remanding for an expert opinion at step three).

A "Disability Determination and Transmittal" form signed by a medical or psychological consultant, a "Psychiatric Review Technique" form, or "various other documents on which medical and psychological consultants may record their findings," can fulfill this requirement to "ensure that this opinion has been obtained at the first two levels of administrative review." *See* SSR 96-6p, 1996 WL 374180, at *3. Here, the Disability Determination and Transmittal form

---

9 Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 US 870, 873 n.3 (1984).

refers to a Psychiatric Review Technique form completed on May 10, 2006, by Mark Garner, Ph.D., for the "Physician or Medical Specialist Signature." (Tr. 75; *see* Tr. 474–87.) Dr. Garner is a psychologist. (See Tr. 75; Program Operations Manual System § DI 26510.090(D), *available at* http://policy.ssa.gov/poms.nsf/lnx/0426510090 (last updated Aug. 29, 2012).) The form he completed addressed only listings for mental impairments: Listing 12.04 for affective disorders and Listing 12.06 for anxiety-related disorders. (Tr. 477, 479.)

Dr. Garner's opinion cannot support a conclusion that Plaintiff's physical impairments were not equivalent to any listing. *See Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001) (finding that a psychologist was not qualified to diagnose a claimant's underlying physical conditions); *cf. Byerley v. Colvin*, No. 12-CV-91, 2013 WL 2145596, at *11 (N.D. Ind. May 14, 2013) ("Because the psychologist who prepared the form did not consider physical impairments, it cannot be relied on as expert opinion that Plaintiff's combination of physical and mental impairments do not equal a Listing."); *Watson v. Massanari*, No. 00-3621, 2001 WL 1160036, at *14 (E.D. Pa. Sept. 6, 2001) (remanding "so that the ALJ can enlist the services of a medical expert capable of making an equivalency finding as to Plaintiff's impairments *in combination*," where the expert opinions on equivalence in the record expressly addressed only the claimant's physical impairments).

The Court's review of the record, from the limited standpoint of a layperson, suggests it is at least plausible that Plaintiff's impairments could medically equal Listing 14.06 for undifferentiated and mixed connective tissue disease (which "includes syndromes with . . . the serologic (blood test) findings of rheumatoid arthritis") or Listing 14.09 for inflammatory

20

arthritis. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1; *see also* S.S.R. 12-2p, 2012 WL 3104869, at *6 (2012) ("[Fibromyalgia ('FM')] cannot meet a listing in appendix 1 because FM is not a listed impairment. At step 3, therefore, we determine whether FM medically equals a listing (for example, listing 14.09D in the listing for inflammatory arthritis), or whether it medically equals a listing in combination with at least one other medically determinable impairment."). The Court therefore recommends remanding this case for a medical opinion on the issue of equivalence.

## VI. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court finds that the Administrative Law Judge erred in failing to rely on the opinion of a medical expert regarding whether Plaintiff's physical impairments medically equal the severity of one of the "listed" impairments that the Commissioner considers presumptively disabling. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (Dkt. 12) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised

that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier*, 454 F.3d at 596–97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  February 18, 2014


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 18, 2014.


s/Jane Johnson
Deputy Clerk

22